[Cite as *Cordova v. Emergency Professional Servs., Inc.*, 2017-Ohio-7245.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No. 105061

---

# LYNN CORDOVA, ET AL.

### PLAINTIFFS-APPELLANTS

vs.

# EMERGENCY PROFESSIONAL SERVICES, INC., ET AL.

### DEFENDANTS-APPELLEES

---

**JUDGMENT:**
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-14-834741

**BEFORE:** Boyle, J., Keough, A.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** August 17, 2017

**ATTORNEYS FOR APPELLANTS**

Stuart E. Scott
Dustin B. Herman
Spangenberg, Shibley & Liber, L.L.P.
1001 Lakeside Avenue East, Suite 1700
Cleveland, Ohio   44114


**ATTORNEYS FOR APPELLEE**

**For Thomas Mucci, D.O.**

Erin Siebenhar Hess
Reminger Co., L.P.A.
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio   44115

**Also Listed:**

**For Community Health Systems
Professional Services Corporation**

Michael Ockerman
Rocco D. Potenza
Hanna, Campbell & Powell, L.L.P.
3737 Embassy Parkway, Suite 100
Akron, Ohio   44333

**For Emergency Professional Services, Inc.**

Philip J. Truax
Wickens, Herzer, Panza, Cook & Batista
35765 Chester Road
Avon, Ohio   44011-1262

**For Youngstown Ohio Hospital Company, L.L.C., d.b.a. Northside Medical Center**

Youngstown Ohio Hospital Company
c/o CSC Lawyers Incorporating Service
50 West Broad Street, Suite 1800
Columbus, Ohio    43215

MARY J. BOYLE, J.:

{¶1} This appeal involves a medical malpractice action following a unanimous jury verdict in favor of defendant-appellee, Thomas Mucci, D.O. Plaintiffs-appellants, Lynn and Raymond Cordova, in their sole assignment of error, argue that the trial court impermissibly refused to excuse juror No. 3 — an internal medicine physician — for cause.

{¶2} This appeal strikes at the core of our legal system: the jury. The purpose of our jury system is to impress upon the community as a whole that a verdict is given in accordance with the law by persons who are fair and impartial. *See Powers v. Ohio*, 499 U.S. 400, 111 S.Ct.1364, 113 L.Ed.2d 411 (1991). Stated another way, "the quest is for jurors who will conscientiously apply the law and find the facts." *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

{¶3} The Cordovas claim that they did not receive a fair jury composition because the trial court refused to remove juror No. 3 for cause, which forced them to use one of their three peremptory challenges to remove her from the venire and precluded them from exercising a peremptory challenge on another prospective juror. They ask this court to adopt a position that any potential juror, who has specialized experience, education, or knowledge about a field of study at issue in a case, must be excused for cause even if that prospective juror states that he or she will be fair, impartial, and will follow the law. Not only do we find the record void of evidence that juror No. 3 would

not follow the law or would not be fair and impartial, we also decline to adopt the Cordovas' position regarding the removal of prospective jurors with challenges for cause.

{¶4}   For the reasons that follow, we affirm.

## I.    Procedural History

### A.    Nature of the Lawsuit

{¶5}   The Cordovas filed a medical malpractice complaint against several parties, including Dr. Mucci.[1]    The Cordovas alleged that Lynn had recently been diagnosed with diverticulitis by her primary care physician.  According to the Cordovas, when Lynn later went to the emergency room, she told Dr. Mucci about the diagnosis for diverticulitis, but Dr. Mucci improperly diagnosed and treated Lynn for irritable bowel syndrome.  The Cordovas claimed that Lynn's diverticulitis worsened until her bowel ruptured, necessitating emergency life-saving surgery, the removal of 90 percent of Lynn's large intestine, and leaving her with a colostomy bag.  They asserted that Dr. Mucci's negligent care and treatment caused Lynn's injuries for which they sought monetary damages.

{¶6}   Dr. Mucci argued that he met the standard of care in his treatment of Lynn at the emergency room.  Dr. Mucci argued that nothing, including antibiotics or a CAT scan, would have prevented Lynn's injuries.  According to Dr. Mucci, after he diagnosed Lynn with irritable bowel syndrome in the emergency room, she developed an obstruction, which led to a perforation located on the other side of her bowel from where

---

[1]The only defendant-appellee in this appeal is Dr. Mucci.

the diverticula is located. Dr. Mucci argued that the obstruction and perforation, which were not present during his examination of Lynn at the emergency room, are what led to the emergency life-saving surgery and caused Lynn's resulting injuries.

**B.    Voir Dire**

**{¶7}** The case proceeded to a jury trial and jury selection began. The case would center around diverticulitis and irritable bowel syndrome, along with their symptoms, causes, diagnoses, and treatment options.

**{¶8}** During voir dire, the trial court seated the first set of eight prospective jurors. Notably, several of the prospective jurors had medical backgrounds: juror No. 1 — a cardiothoracic surgical intensive care nurse; juror No. 3 — an internal medicine physician; juror No. 5 — a nurse practitioner with an anesthesiologist husband; and juror No. 6 — an infectious disease physician.

**{¶9}** At the outset of the voir dire, the trial court explained the following:

It's a common experience, however, that no matter how skillful the examination may be, no matter how extensive its scope, after it is all over there may lurk in the minds of you some deep-rooted reason why you cannot be fair and impartial to sit as a juror in this case, and no question may bring this out.

If that's the case, we want you to speak out frankly so we may be assured that the jury chosen to try the issues in this case will decide them fairly and impartially to both the Plaintiff and Defense.

**{¶10}** The trial court then questioned the prospective jurors individually. Juror No. 3 explained that she had been an internal medicine physician for 20 years. The trial court then asked juror No. 3 the following:

Q. The burden of proof is to prove their case, causation, damages, by a preponderance of the evidence, the greater weight of the evidence. Can you do that?

A. Yes.

* * *

Q. Can you test the credibility or believability of the witnesses?

A. Yes.

Q. Okay. Because [there are] going to be experts coming in, so to speak, and you're going to have to weigh their testimony. Fair enough?

A. Yes.

Q. Any prejudices that you had that you can set aside?

A. Yes.

* * *

Q. Any reason you feel you can't be fair and impartial to anybody here?

A. No.

{¶11} After the trial court completed its questioning of the prospective jurors, the Cordovas' counsel questioned them. The following reflects his questioning of juror No. 3:

Q. [T]his internal medicine, area of diverticulitis, irritable bowel syndrome is right in your bailiwick in terms of your training and experience in your day-to-day practice?

A. Yes.

Q.    Can you tell us what training and your experience is with regards to the diagnosis and treatment of first diverticulitis?

A.    Um, in terms of training, internal medicine, I don't have a sub-specialty.    I'm a primary care physician.    In terms of experience, I treat both through the hospital as well as at the hospital.

* * *

Q.    The thing is you heard from the Judge when he was reading to you about the lawsuit, a primary care physician actually diagnosed Lynn Cordova with diverticulitis in the office setting. Is that something you have ever done, diagnosed diverticulitis in the office setting?

A.    Yes.

Q.    And I assume that you've had training through your residency and experience to do that, to diagnose diverticulitis based on its clinical symptoms and signs in the office?

A.    Yes.

Q.    How frequently do you see diverticulitis as a diagnosis in your office based — the office based portion of your practice?

A.    In the office itself it comes up maybe once maybe every two months.

Q.    And based on the training that you've received, what are the signs, symptoms, and manner in which you diagnose diverticulitis —

[Dr. Mucci's counsel objected and the trial court sustained the objection.]

Q.    Is there — to your knowledge, is there a difference in the diagnosis of diverticulitis in the office setting as opposed to the emergency medicine or emergency department setting?

[Dr. Mucci's counsel objected and the trial court sustained the objection.]

Q. There's obviously going to be other doctors who are going to come and testify with regards to the medical issues in this case, about the diagnosis and how diverticulitis and irritable bowel syndrome are diagnosed. Given that you have, obviously, a lot of firsthand experience, training and so forth, are you going to be able to set aside your knowledge and listen and rely only on the evidence that comes through the records, or through witnesses, who will be presented throughout the course of the trial, or is it going to be kind of hard to set aside what you actually — what you actually know?

A. I don't think I can set aside my knowledge. It's my knowledge.

Q. Is irritable bowel syndrome a diagnosis that you make as an internal medicine doctor?

A. Yes.

Q. And have you received education, training and on-the-job experience in the diagnosis of irritable bowel syndrome?

A. Yes, through residency. No sub-specialty.

Q. Is that a diagnosis that you personally make in the office, in the office setting?

A. Yes.

Q. Is there anything about the fact that you're a trained physician in — an internal medicine trained physician, given that this is a medical negligence case, before you've heard really any of the facts about the case, just a little bit that would make you even slightly lean one way or the other in favor of the patient or in favor of Dr. Mucci?

A. The initial, when I heard it was malpractice, medical malpractice, I guess — I guess my initial reaction would be to sympathize with the physician.

Q. That's very fair. That's a natural reaction, is to — is to feel sympathy. Now, you're going to hear from the Judge later that sympathy isn't part of your job. That's that natural, human emotion, but you're supposed to set aside your sympathies for either the Plaintiff or the Defendant in the case. Do you feel that this, because of the facts — specific facts of this case, and the fact that

it's a medical negligence case, do you feel that it would be hard for you to be totally impartial to both sides, given that you are a physician, you have knowledge about this — you do have knowledge about the facts of this case?    Do you feel that maybe this would be a hard case for you to sit on and be totally fair and impartial to both sides?

A.      I think it would be hard.    I would try. I would certainly try.

Q.      Do you think maybe there's probably a better case out there for you in your experience to sit on than this case?

A.      Probably.

* * *

Q.      I'm going to ask you [juror No. 3] because you are a practicing physician.    Specifically, when it comes to medical, legal cases, just like this one is, do you have a sense of are most of them legitimate, some not legitimate? How do you lean?

A.      I say — I say most are, some aren't.    I guess you always hear about — people always talk about the ones that aren't legitimate that tend to come up to court.    Really most are legitimate.

* * *

Q.      I got to ask the same question of you, [juror No. 3].    If you went back to work, and, obviously, people are going to ask you, what kind of case did you sit on? And you explained to them that you found in favor of a patient in that medical negligence case, is that going to be uncomfortable for you, difficult for you?

A.      No.

* * *

Q.      [Juror No. 3], would you file a medical negligence claim against a fellow, a fellow physician if you thought that the doctor was negligent?

[Dr. Mucci's counsel objected, and the trial court overruled the objection.]

Q.    No.

A.    Why not?

Q.    It's just me.

**{¶12}** After the Cordovas' counsel completed his questioning, Dr. Mucci's counsel began questioning the prospective jurors and posed the following question:

> The Judge will give you the law in Ohio, and it states that physicians are required to follow the standard of care, okay?
>
> You will hear testimony from Dr. Mucci, and you'll hear testimony from other physicians.
>
> Will all of you hold them to that burden of proving to you that Dr. Mucci breached the standard of care by demonstrating it through credible experts? Will everybody hold them to that standard if that's what the law says?

None of the prospective jurors, including juror No. 3, responded that he or she could not do so. Dr. Mucci's counsel continued with her voir dire questioning of juror No. 3, and the trial court interjected with a question:

> [Counsel]:   [A]re you comfortable — nobody is going to ask you to pretend that you're not a doctor, but can you take the testimony that comes from the witness stand and use that to make your decision to be fair to both sides versus what you already know from your training?
>
> [Juror]:   Yes.
>
> [Court]:   Can you do that? You heard already from what was read in the complaint and what Mr. Scott said is that the claim is going to be antibiotics should have been given. And you're going to hear testimony that antibiotics should not have been given from experts and from Dr. Mucci. Just what you know from your practice, do you say to yourself that has to be wrong because I've heard of people doing that with

diverticulitis? Is anybody saying that as I'm standing here right now? Because we know that you think just based on your own experience or your own care of patients? You feel like that, [juror No. 3]?

[Juror]:    No.

**{¶13}** Juror No. 3 also revealed that her sister and parents were internal medicine

physicians.    Dr. Mucci's counsel then asked juror No. 3:

Obviously you can set aside your own personal knowledge. You can refrain from talking about this if you're on the jury and use what you hear in this witness stand to make your decision, right? Fair enough?

From the record, there is no indication that juror No. 3 responded that she

could not do so.

**{¶14}** After all of this colloquy, at sidebar, the Cordovas challenged juror No. 3 for

cause:

[Counsel]:    I would come here and make [a] challenge for cause on [juror No. 3].
[Court]:      I'll deny it.

[Counsel]:    The reason for the challenge for cause is that [juror No. 3] indicated in the questioning that she would lean — she leans in favor of the health care provider [Dr. Mucci] in this case based upon nothing more than the fact that she knows this is a medical negligence case, and prior to hearing any of the evidence, or testimony, and she also testified that she herself would not pursue the medical negligence case against a fellow colleague even if she believed that she had good grounds to do so.

[Court]:      I'll deny it.

**{¶15}** After the trial court denied their challenge for cause, the Cordovas used their

first peremptory challenge to remove juror No. 3.    The Cordovas used their next

peremptory challenge to remove juror No. 6, the infectious disease physician. The Cordovas used their final peremptory challenge to remove the new juror No. 6, a school teacher whose husband was a pediatrician and whose daughter-in-law was a pathologist.

{¶16} The trial proceeded, and the jury returned a unanimous verdict in favor of the defense.

{¶17} It is from the trial court's denial to excuse juror No. 3 for cause that the Cordovas appeal. Their sole assignment of error is as follows:

> The trial court impermissibly refused to excuse a juror who should have been dismissed for cause.

## II. Analysis

### A. Standard of Review

{¶18} The Cordovas rely on R.C. 2313.17(B)(9) and 2313.17(D). They argue that the standard of review for a principal challenge to a juror for cause under R.C. 2313.17(B)(9) is whether the "weight of the evidence presented to the court supports its determination that the challenge has or has not been proven." The Cordovas concede, however, that an abuse of discretion standard applies when reviewing a challenge to a juror for cause under R.C. 2313.17(D).

{¶19} Dr. Mucci argues that an abuse of discretion standard applies when we review a challenge to a juror for cause under either R.C. 2313.17(B)(9) or 2313.17(D).

{¶20} This court, along with others, has held that a ruling on a challenge to a juror for cause, pursuant to R.C. 2313.17(B)(9) or 2313.17(D), will not be overturned on appeal unless it appears that the trial court abused its discretion. *State v. Dye*, 8th Dist.

Cuyahoga No. 103907, 2016-Ohio-8044, ¶ 24; *see also Giusti v. Felten*, 9th Dist. Summit Nos. 26611 and 26695, 2014-Ohio-3115 (challenges to jurors under R.C. 2313.17(B)(9) and 2313.17(D) will not be disturbed on appeal absent an abuse of discretion); *Brown v. Martin*, 5th Dist. Fairfield No. 14-CA-31, 2015-Ohio-503 (the trial court did not abuse its discretion when it denied a challenge for cause under R.C. 2323.17(B)(9)); *Westfall v. Aultman Hosp.,* 5th Dist. Stark No. 2015CA00223, 2017-Ohio-1250 (no abuse of discretion for trial court's denial of challenge for cause under R.C. 2313.17(B)(9)); *State v. Kuck*, 2d Dist. Darke No. 2015-CA-13, 2016-Ohio-8512 (abuse of discretion standard used in determining whether a jury should have been excused for cause under R.C. 2313.17(B)(9)).

{¶21} "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *In re C.K.*, 2d Dist. Montgomery No. 25728, 2013-Ohio-4513, ¶ 13, citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). To find that a trial court abused its discretion, "the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 256, 662 N.E.2d 1 (1996).

{¶22} We will review the Cordovas' sole assignment of error using an abuse of discretion standard.

**B. R.C. 2313.17(B)(9)**

{¶23} The Cordovas first argue that R.C. 2313.17(B)(9) is a principal challenge that prohibits any attempt to rehabilitate by either court or counsel and that juror No. 3's answers to the voir dire questions required the trial court to automatically excuse her for cause. According to the Cordovas, "because she was a physician and this was a medical malpractice case brought against a physician," juror No. 3 could not be fair and impartial. And the Cordovas assert that "Juror No. Three clearly indicated that she would not be able to follow the law when she honestly and frankly stated that she could not set her own medical knowledge aside and rely solely on the evidence presented."

{¶24} At trial, however, when the Cordovas asked the trial court to excuse juror No. 3 for cause, they did not argue that juror No. 3 would not follow the law.[2] Rather, their argument focused on the fact that juror No. 3 was an internal medicine physician who "lean[ed] in favor" of the defense because "she herself would not pursue the medical negligence case against a fellow colleague even if she believed she had good grounds to do so."

{¶25} Dr. Mucci argues that the Cordovas failed to prove that juror No. 3 could not be fair and impartial and could not follow the law. According to Dr. Mucci, juror No. 3 stated several times that she could be fair and impartial in this matter; that she

_____

[2] Generally speaking, "a court of appeals cannot consider an issue for the first time without the trial court having had an opportunity to address the issue." *State v. Peagler*, 76 Ohio St.3d 496, 501, 668 N.E.2d 489 (1996). Because the Cordovas' appeal centers around the for-cause challenge to juror No. 3, we will consider the argument raised now about the juror's alleged inability to the follow the law. We do note, however, that the trial court did not have this precise argument before it when deciding to deny the Cordovas' challenge for cause.

"could set aside prejudice and fairly weigh the opinions of the experts, despite her background as a physician"; and that she "unequivocally stated that she would be comfortable setting her medical training aside, to take the testimony that comes from the witness stand, and to use that to make her decision."

**{¶26}** R.C. 2313.17(B) sets forth nine "good causes for challenge to any person called as a juror." One of the nine "good causes" is "[t]hat the person discloses by the person's answers that the person cannot be fair and impartial or will not follow the law as given to the person by the court." R.C. 2313.17(B)(9). R.C. 2313.17(C) specifically states that "[e]ach challenge listed in division (B) of this section shall be considered as a principal challenge, and its validity tried by the court." We agree with the Cordovas that, based on the precise language of R.C. 2313.17(C), a challenge under R.C. 2313.17(B)(9) is a principal challenge.

**{¶27}** Under Ohio law, if a principal challenge is found valid, "the court [must] dismiss the prospective juror, [and may] not rehabilitate or exercise discretion to seat the prospective juror upon the prospective juror's pledge of fairness[.]" *State v. Swift*, 9th Dist. Summit No. 27084, 2014-Ohio-4041, ¶ 4, citing *Hall v. Banc One Mgt. Corp.,* 114 Ohio St.3d 484, 2007-Ohio-4640, 873 N.E.2d 290. "[W]here a party establishes the existence of facts supporting a principal challenge, this finding 'result[s] in automatic disqualification,' and no rehabilitation of the potential juror can occur." *Hall* at ¶ 29.

**{¶28}** In *Westfield v. Aultman Hosp.,* 5th Dist. Stark No. 2015CA00223, 2017-Ohio-1250, a medical malpractice case, the Fifth District analyzed a challenge of a

juror for cause under R.C. 2313.17(B)(9). The plaintiff in *Westfield* argued that the trial court committed prejudicial error because it denied a challenge for cause when a prospective juror stated that he could not hold himself to the standard instructed by the trial court and that he would hold the plaintiff to a higher standard. After the juror's initial answer, however, the trial court asked another question about the standard of proof and the juror responded, "I would be uncomfortable with it, but I would follow the law, yes." The trial court denied the plaintiff's challenge for cause.

{¶29} In affirming the trial court, the Fifth District held that "[a]s long as a trial court is satisfied, following additional questioning of a prospective juror, that the juror can be fair and impartial and follow the law as instructed, the court need not remove that juror for cause." *Id.* at ¶ 57, citing *Giusti*, 9th Dist. Summit Nos. 26611 and 26695, 2014-Ohio-3115; *see also State v. Dye*, 8th Dist. Cuyahoga No. 103907, 2016-Ohio-8044 (trial court did not abuse its discretion in declining to remove a juror for cause under R.C. 2313.17(B)(9) even though her initial statements cast some doubt on her impartiality).

{¶30} In order to fully determine the first argument related to the Cordovas' assignment of error, we must analyze whether the Cordovas established the existence of facts supporting a valid principal challenge under R.C. 2313.17(B)(9) that juror No. 3 would not be fair and impartial or would not follow the law as given by the court, which would have required her automatic disqualification as a juror.

{¶31} At the outset of the voir dire questioning, juror No. 3 replied "no" to the trial court's question, "Any reason you feel you can't be fair and impartial to anybody here?"

As an internal medicine physician, juror No. 3 explained that she had experience in diagnosing and treating diverticulitis and irritable bowel syndrome. Although juror No. 3 stated that she thought it would be hard for her to sit as a juror on this medical malpractice case and be totally fair and impartial, she also stated that "[she] would try. [She] would certainly try."

{¶32} At no time did juror No. 3 state that she could not be fair and impartial to either the Cordovas or Dr. Mucci despite being instructed by the trial court to "speak out frankly so we may be assured that the jury chosen to try the issues in this case will decide them fairly and impartially to both the Plaintiff and Defense." And juror No. 3 candidly admitted that she would not initiate a medical malpractice case against a colleague, but she stated that she believed most medical malpractice cases "[were] legitimate" and that she would be comfortable returning a verdict in favor of a patient.

{¶33} During voir dire, the Cordovas' counsel asked juror No. 3 the following question:

> There's obviously going to be other doctors who are going to come and testify with regards to the medical issues in this case. * * * Given that you have, obviously, a lot of firsthand experience, training and so forth, are you going to be able to set aside your knowledge and listen and rely only on the evidence that comes through the records, or through witnesses, who will be presented throughout the course of the trial, or is it going to be kind of hard to set aside what you actually — what you actually know?

Juror No. 3 responded, "I don't think I can set aside my knowledge. It's my knowledge."

{¶34} Contrary to the Cordovas' argument that this answer required her automatic dismissal, we do not find that this statement means that juror No. 3 could not follow the law as given by the trial court. Juror No. 3 simply stated that she does not "think" that she could set aside her medical knowledge. She never said that she could not follow the law as given by the trial court.

{¶35} In 1998, Ohio passed Am.Sub.S.B. No. 69 ("S.B. 69"), which repealed all exemptions, including those for elected public officials and attorneys, from jury service. With the new law, "no person [was] exempt from" jury service for any reason. S.B. 69. The state of Ohio eliminated all exemptions to jury service because of the recommendations made to the General Assembly by the Chief Justice of the Ohio Supreme Court, Thomas Moyer, in his 1997 address on the state of the judiciary. The Chief Justice stated:

> Through the years, statutory exemptions for certain occupations, and even those who have reached age 70, have been adopted. They are all persons whose knowledge and experience could lend wisdom to a jury. Why do we exempt persons who would make good jurors? * * * I cannot think of a logical answer to that question.

To find that juror No. 3's specialized knowledge required her automatic dismissal would contradict the very reason why our law permits the empaneling of "good jurors" — those whose knowledge and experience can lend wisdom to the jury.

{¶36} Moreover, in other questioning, juror No. 3 indicated that she could follow the evidence and instructions of the trial court to render a decision, which is precisely what the law cited by the Cordovas requires. *Smith v. Phillips*, 455 U.S. 209, 217, 102

S.Ct. 940, 71 L.Ed.2d 78 (1982) (due process means a jury capable and willing to decide the case solely on the evidence before it). Juror No. 3 specifically told the trial court she could follow the burden of proof in the case, she could weigh the testimony of the experts, she could test the credibility of the witnesses, and she could set aside any prejudices she had in rendering a verdict.

**{¶37}** Dr. Mucci's counsel also asked juror No. 3, "[N]obody is going to ask you to pretend that you're not a doctor, but can you take the testimony that comes from the witness stand and use that to make your decision to be fair to both sides versus what you already know from your training?" Juror No. 3 responded, "Yes." Then, the trial court made sure by stating, "Just what you know from your practice, do you say to yourself that has to be wrong * * * based on your own experience or your own care of patients?" Juror No. 3 responded, "No."

**{¶38}** Although the Cordovas want us to only consider the answers given by juror No. 3 to their counsel, we decline to do so. Legal precedent permits our consideration of all voir dire answers given by juror No. 3. *See Westfield,* 5th Dist. Stark No. 2015CA00223, 2017-Ohio-1250; *Dye*, 8th Dist. Cuyahoga No. 103907, 2016-Ohio-8044.

**{¶39}** Juror No. 3's answers to the voir dire questions did not disclose that she could not follow the law or that she could not be fair and impartial. Rather, her answers proved the opposite and that she would "certainly try" to do so, which is all we can ask of jurors. Therefore, we find that the Cordovas failed to establish the existence of facts to

support a valid principal challenge that juror No. 3 would not be fair and impartial or would not follow the law as given by the trial court, which would have required the trial court to automatically excuse juror No. 3 for cause.

## C. R.C. 2313.17(D)

{¶40} The Cordovas' second and third arguments focus on R.C. 2313.17(D). They claim that the trial court abused its discretion by failing to excuse juror No. 3 pursuant to R.C. 2313.17(D) because juror No. 3's answers exposed her "bias and partiality toward [Dr. Mucci]." The Cordovas also argue that juror No. 3 should have been excused for cause because she "was a medical doctor who had specialized knowledge and training in the subject matter at issue and who stated she could not set aside her own knowledge and rely solely on the evidence presented."

{¶41} Dr. Mucci argues that the Cordovas' challenge under R.C. 2313.17(D) is "baseless and irrelevant" because juror No. 3 "unequivocally ensured the court and counsel that she could be fair, impartial and unbiased." According to Dr. Mucci, "there is no authority — statutory or otherwise — that require[d] the trial court to dismiss jurors for cause solely because they have experience or knowledge regarding the issues presented at trial, especially where the prospective juror ensures that such knowledge and experience will not affect his or her ability to be fair and impartial."

{¶42} R.C. 2313.17(D) provides as follows:

In addition to the causes listed in division (B) of this section, any petit juror may be challenged on suspicion of prejudice against or partiality for either party, or for want of a competent knowledge of the English language, or other cause that may render the juror at the time an unsuitable juror. The

validity of the challenge shall be determined by the court and be sustained if the court has any doubt as to the juror being entirely unbiased.

{¶43} The determination as to whether a juror is biased involves a judgment of credibility, the basis of which may not always be apparent from the record on appeal and, therefore, a reviewing court will defer to the trial judge who sees and hears the juror. *State v. Huertas*, 51 Ohio St.3d 22, 23, 553 N.E.2d 1058 (1990); *see also Berk v. Matthews*, 53 Ohio St.3d 161, 559 N.E.2d 1301 (1990).

{¶44} We have already found that juror No. 3 could have been fair and impartial and could have followed the law. And contrary to the Cordovas' argument, we do not find any unresolved uncertainty about whether she could have been entirely unbiased. After juror No. 3's initial voir dire answers, Dr. Mucci's counsel asked questions and the trial court asked an additional question of juror No. 3 to ensure she could be fair and impartial. The Cordovas could have asked additional questions of juror No. 3 if they believed there remained any unresolved uncertainty about whether she could be fair and impartial. They chose not to do so.

{¶45} The Cordovas further complain that the trial court refused to allow juror No. 3 to answer certain questions about diverticulitis. Specifically, the trial court sustained objections when the Cordovas' counsel questioned juror No. 3 about the "signs, symptoms and manner in which you diagnose diverticulitis" and whether there is "a difference in the diagnosis of diverticulitis in the office setting as opposed" to the emergency department setting. The questions asked by the Cordovas' counsel were aimed at the very issues dispositive of the medical malpractice case. Permitting juror

No. 3 to answer had the potential of confusing and tainting the views of the other prospective jurors about a material fact that should only have been decided by the jury based upon the evidence presented at trial. We do not find error in the trial court's refusal to allow juror No. 3 to answer the questions.

{¶46} The Cordovas' reliance on *Sowers v. Middletown Hosp.*, 89 Ohio App.3d 572, 626 N.E.2d 968 (12th Dist.1993), is also misplaced. In *Sowers*, the plaintiffs filed a medical malpractice claim against the defendants as a result of the defendants' negligence during the labor and delivery of the plaintiffs' son. After a defense verdict, the plaintiffs appealed and argued that the trial court made erroneous rulings on challenges to jurors for cause.

{¶47} The Twelfth District affirmed that the trial court properly granted an agreed-upon challenge for cause of a nurse who worked in labor and delivery. During voir dire, the nurse stated that she would have her own interpretations of the fetal monitor strips that would be crucial evidence at the trial. Thus, the Twelfth District held that the nurse's statements evidenced an inability to be impartial during the interpretation of the fetal monitor strips by the parties' experts. The *Sowers* court, however, refused to adopt the plaintiffs' broad position that all nurses and medical personnel should be excluded as jurors in a medical malpractice case because of their "inherent bias" toward physicians and hospitals.

{¶48} We find the facts of *Sowers* to be distinguishable. The parties did not agree that juror No. 3 should be excused for cause. Moreover, juror No. 3 never

indicated that she had her own interpretation of any evidence crucial to the medical malpractice claim or that she would not listen to the expert testimony. On the contrary, juror No. 3 assured the trial court and counsel that she could be fair and impartial; that she could listen to the experts and weigh their testimony; that she could set aside any prejudices; and that she could follow the law by taking the testimony that comes from the witness stand and using it to make a decision that was fair to both sides versus what she already knew from her medical training.

{¶49} Given the record before us and giving deference to the trial court who saw and heard juror No. 3, we cannot say that the trial court abused its discretion in denying the Cordovas' challenge of juror No. 3 for cause under R.C. 2313.17(D).

### D. New Trial

{¶50} The Cordovas argue that a new trial is necessary because the trial court impermissibly forced them to use a peremptory challenge to strike juror No. 3. At oral argument, the Cordovas claimed that they were prejudiced because if they would have had a remaining peremptory challenge, they would have used it to dismiss juror No. 5 — a nurse practitioner with an anesthesiologist husband — who served as the jury foreperson.

{¶51} Given our decision that the trial court did not abuse its discretion in denying the Cordovas' challenge to remove juror No. 3 for cause under R.C. 2313.19(B)(9) and 2313.19(D), this argument is moot. We are compelled, however, to comment on the issue.

**{¶52}** There is nothing in the record before us that suggests that the Cordovas asked for more peremptory challenges due to the unique medical professional make-up of the prospective jurors. Moreover, the record shows that after the Cordovas used a peremptory challenge to excuse juror No. 3, they then excused juror No. 6 — the infectious disease physician. With their final peremptory challenge, the Cordovas excused new juror No. 6 — a school teacher with a pediatrician husband and daughter-in-law pathologist. Thus, the Cordovas had peremptory challenges that they could have used to excuse juror No. 5, but they chose not to do so.

**{¶53}** Therefore, even if we were to consider the merits of the Cordovas' argument, we would be reluctant to find any prejudice to them.

## III. Conclusion

**{¶54}** We find that an abuse of discretion standard of review applies when we review a trial court's denial of a challenge to a juror for cause under R.C. 2313.19(B)(9) and 2313.19(D). We also find that a challenge to a juror under R.C. 2313.19(B)(9) is a principal challenge. And we find that the trial court did not abuse its discretion when it denied the Cordovas' challenge to dismiss juror No. 3 for cause under R.C. 2313.19(B)(9) or 2313.19(D). The Cordovas' sole assignment of error is overruled, and the judgment is affirmed.

It is ordered that appellee recover from appellants the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
EILEEN A. GALLAGHER, J., CONCUR